IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLOYD DELGADO, | No. C 16-2030 WHA (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| JAMES McDONALD, Warden, | |
| Respondent. | |

## INTRODUCTION

Petitioner, a California prisoner, filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. 2254. He claims that (1) an incorrect instruction on self-defense violated his right to due process; and (2) the prosecution relied on his post-*Miranda* silence as proof of guilt. Respondent filed an answer with a supporting memorandum and exhibits, and petitioner filed a traverse. All of these papers have been considered, and for the reasons discussed below, the petition is **DENIED.**

## STATEMENT

I.  PROCEDURAL BACKGROUND

In 2012, a jury in Santa Clara County convicted petitioner of voluntary manslaughter and assault with a deadly weapon. He was acquitted on charges of murder and attempted premeditated murder. The trial court sentenced him to a total term of 12 years in state prison. His appeals to the California Court of Appeal and the California Supreme Court were denied. This federal habeas petition followed.

II. FACTUAL BACKGROUND

The following background facts are based upon the facts set forth in the last explained state court opinion, *People v. Delgado*, 2015 WL 3830345 (Cal. Ct. App. June 22, 2015) (Resp. Exh. F), and they are reasonably supported by the record.

On April 26, 2009 at approximately 12:30 p.m., petitioner, and his two co-defendants Joseph Correa and Ralph Ojeda, went to the apartment complex at 711 Northrup Street in San Jose to confront Hamilton Hyatt over allegations that he had "choked," "pushed," and "cussed out" petitioner's sister, Rachel Duran (*id*. at 9). Hyatt and Duran were in a long-term relationship, and had gotten into a physical altercation the night before.

When they arrived, Correa offered to go up to the apartment with petitioner. Petitioner replied, "No. It's cool. I'm just going to talk to him" (*id*. at 10). Correa handed petitioner a knife telling him to take it, "just in case" (*ibid*.). Petitioner went to Hyatt's sister's apartment, but Hyatt was not there. Before the three men left, Hyatt arrived in a car with several men. Petitioner testified that the men jumped out of the vehicle and ran towards him. Petitioner pulled out the knife and waved it around to keep them away, but not to stab anyone.

Petitioner and Hyatt began to argue over the incident. Hyatt called Duran a "lying ass ho" (*ibid*.). Petitioner testified that he got angry that Hyatt insulted his sister, so he "ran at" Hyatt (*ibid*.). He was not intending to stab Hyatt, but the knife was still in his hand as he chased him. Petitioner caught Hyatt by the shirt when, according to petitioner, he felt someone punch him in the back of the head. Petitioner let go of Hyatt, turned around, and saw a man he did not recognize holding what appeared to be a small baseball bat. Hyatt said that he saw his cousin Michael Hazard come "the other way kicking, like a ninja kick, a karate kick in the air" (*id.* at 5). Petitioner reacted by swinging the knife towards the "big blur" that had kicked him (*id.* at 10-11). Petitioner then saw Hazard on the ground. Hazard, who had been stabbed in the neck by the knife, jumped up, ran back to the car, and started driving toward a nearby hospital. During this time, petitioner, Correa, and Ojeda ran back to their car. According to Correa, petitioner sounded panicked and said, "I think I stabbed somebody" (*id*. at 12).

Hyatt and his friends found Hazard unconscious a short distance away. The paramedics

arrived and pronounced Hazard dead at the scene. Sometime later at Ojeda's apartment, petitioner learned that Hazard had died.

At approximately 11:00 p.m., Sergeant Heather Randol stopped a vehicle driven by Ojeda. As a result of the stop, Randol and three officers went to Ojeda's apartment to conduct a parole search. Petitioner and Correa were both at the apartment when they arrived. Petitioner identified himself to Randol as "Floyd Munoz" *(id.* at 18). At that time, none of the officers knew that petitioner, Correa, or Ojeda were suspects in Hazard's death.

The following morning, Sergeant Randol discovered that "Floyd Munoz" was Floyd Delgado and that he was a homicide suspect. Detective Brian Spears and two other officers went back to Ojeda's apartment that day and arrested petitioner, Correa, and Ojeda. Petitioner invoked his *Miranda* Rights.

## ANALYSIS

I. STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.§ 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

3

state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

II. ISSUES PRESENTED

As grounds for federal habeas relief, petitioner asserts that: (1) the trial court incorrectly instructed the jury on self-defense, violating his rights to due process and a fair trial; and (2) the prosecutor improperly referred to petitioner's post-arrest/post-*Miranda* silence, in violation of his right to due process.

1. JURY INSTRUCTION

Petitioner claims that the trial court gave an incorrect instruction on the right to self-defense when a person uses non-deadly force in mutual combat or as the initial aggressor. He contends the instruction impermissibly allowed the jurors to reject his self-defense theory.

The jury was given CALCRIM No. 3471:

> A person who engages in mutual combat or who starts a fight has a right to self-defense only if: 1. He actually and in good faith tried to stop fighting; and 2. Indicated, by word or by conduct, to his opponent, . . . that he wanted to stop fighting and that he had stopped fighting; and 3. He gave his opponent a chance to stop fighting.
> However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the *defendant could not withdraw* from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting, communicate the desire to stop to the opponent, or give the opponent the chance to stop fighting.

(Exh. F at 14) (emphasis added).

Petitioner's claim centers on the absence of two words in the second paragraph: "with safety." Petitioner asserts that in this context state law allows a defendant to act in self-defense when he or she is unable to "withdraw with safety," not simply unable to "withdraw."

4

1  Petitioner claims he retreated from the fight but he could not do so safely, and therefore he had
2  the right to act in self-defense.  Because the instruction failed to include the term "with safety,"
3  the jury incorrectly believed that petitioner was not entitled to claim that he acted self-defense.
4  The Court of Appeal rejected petitioner's claim because the trial court's instruction was a
5  correct and adequate statement of California state law (*id.* at 15).  The California cases that
6  speak to the instance of a sudden deadly counter attack use the terms "withdraw" and "retreat
7  with safety," interchangeably. *See People v. Hecker*, 109 Cal. 451, 461, 464 (1895) (holding
8  that "in the limited instance where a defendant c[an] not withdraw," "if he cannot retreat with
9  safety," he is justified in using self-defense); *People v. Sawyer*, 256 Cal.App.2d 66, 75, & n.2
10 (1967) (approving of the trial court's instruction: "[U]nless the attack is so sudden and perilous
11 that he cannot withdraw . . . ."); *People v. Gleghorn*, 193 Cal.App.3d 196, 201 (1987) (the court
12 beginning its analysis with the rule expressed *Sawyer*, while also giving credence to the trial
13 court's instruction that quoted *Hecker*); *People v. Quach*, 16 Cal.App.4th 294, 301-02 (2004)
14 (the court quoting the "retreat with safety" language from *Hecker*, then subsequently quoting
15 the "cannot withdraw" language from *Sawyer*).  In these cases, the term "retreat" is always
16 followed by the qualification "with safety," whereas the term "withdraw" is not.  *See Hecker*,
17 109 Cal. at 461, 464; *Sawyer*, 256 Cal.App.2d at 75, & n.2; *Gleghorn*, 193 Cal.App.3d at 201;
18 *Quach*, 16 Cal.App.4th at 301-02.  The California Court of Appeal rejected petitioner's claim
19 because under state law the terms "retreat with safety" and "withdraw" share a sufficiently
20 similar meaning that either expression is a correct statement as to when a person in California
21 who has instigated a conflict may nonetheless legally use force in self-defense (Exh. F at 15-
22 16).

23       Petitioner's claim is premised on his disagreement with the state appellate court on a
24 question of state law.  A state court's interpretation of state law, including one announced on
25 direct appeal of the challenged conviction or one made by an intermediate appellate court, binds
26 a federal court sitting in habeas corpus.  *See Hicks v. Feiock*, 485 U.S. 624, 629-30 (1988).  A
27 determination of state law must be followed and may not be "'disregarded by a federal court
28 unless it is convinced by other persuasive data that the highest court of the state would decide

otherwise.'" *Id*. at 630 n.3 (quoting *West v. American Telephone & Telegraph Co*., 311 U.S. 223, 237-38 (1940)). Petitioner does not present any persuasive data that the California Supreme Court would determine state law to be otherwise. Petitioner cites no state case law that requires or uses the term "withdraw with safety." Consequently, the California Court of Appeal's interpretation of the rule conferred in *Hecker*, and cases thereafter, is binding here. Petitioner is not entitled to federal habeas relief on his claim of instructional error.

### 2. *DOYLE* ERROR

Petitioner claims that prosecutor committed *Doyle* error when she argued to the jury that his post-*Miranda*, pretrial silence could be used as evidence of his guilt. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (a defendant's silence "at the time of arrest and after receiving *Miranda* warnings" cannot be used to impeach him should he chose to testify at trial). Due Process prohibits introducing evidence of z defendant's post-*Miranda* silence. *Id.* at 618.

The state appellate court summarized the relevant facts below, and they accurately reflect the record.

> Following the close of evidence, the prosecutor argued that Delgado's presentation of false identification to Sergeant Randol demonstrated both his consciousness of guilt and his intent to kill: 'Finally, you have their fleeing, the lies to the police that night when Heather Randol came to Ralph Ojeda's apartment and Floyd Delgado gives her that ID with the fake name on it. And you can't speculate as to how he got a real California ID. I don't know. That would be speculation. It doesn't matter. But he gives her an ID that doesn't have his real name on it. That's what's important. That shows his consciousness of guilt. [¶] None of them report to these officers that they've been attacked, just like they don't call the police and say, 'Hey, we were just attacked, and we had to act in self-defense.'
>
> Correa's counsel objected, claiming the prosecutor improperly commented on petitioner's failure to protest their innocence to police in violation of *Doyle*. The prosecutor explained her argument was addressing 'the contact with [Sergeant] Randol and the other officers who went to do a parole search.' She further noted, 'And I'm in the process of talking about what happened with the police *on the night before the arrests,* at which point none of these defendants were being contacted about any criminal activity at all . . ..'
>
> Ojeda's counsel agreed that there was no *Doyle* error. Delgado's trial counsel, however, made no objection. Correa's counsel allowed [*sic*] that if the prosecutor was referencing only the officers' prearrest contact with the defendants he would not have raised an objection, but maintained the prosecutor's argument was unclear and the jury would not make that distinction. The trial court disagreed and found the argument did not violate *Doyle*.

(Exh. F at 18-19).

6

The California Court of Appeal rejected petitioner's claim, finding that it was "clear from the transcript" that the prosecutor's argument referenced petitioner's silence on April 26 -- prior to his arrest -- rather than his post-*Miranda* silence on April 27 (*id*. at 20). As a result, the court found the prosecutor's comment on petitioner's silence permissible. *See Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) ("The Constitution does not prohibit the use of a defendant's silence for impeachment purposes prior to arrest.").

Petitioner concedes that the prosecutor could properly argue that petitioner's pre-arrest silence showed guilt. He argues, however, that when the prosecutor referred to "these officers," she was commenting on his silence with police in general, including his silence after his arrest and *Miranda* warnings. "[A] prosecution closing argument that broadly condemn[s] appellant['s] silence: pre-*Miranda* and post-*Miranda* violate[s] due process." *United States v. Baker*, 999 F.2d 412, 416 (9th Cir. 1993); *see also United States v. Lopez*, 500 F.3d 840, 844 (9th Cir. 2007) (overbroad questioning and closing argument that encompass post-arrest silence violate *Doyle*). Petitioner was confronted by two sets of officers in a relatively short amount of time. First, Sergeant Randol and three other officers spoke to petitioner prior to his arrest, at approximately 11:00 p.m. on the night of the 26th. Petitioner's next contact with the police came a few hours later — on the morning of the 27th — with different officers who arrested and Mirandized him. According to the prosecutor, her comment about his silence with "these officers" referred only to his first contact with the police prior to arrest, when Sergeant Randol and other officers spoke to him on the 26th.

While there is ambiguity in the prosecutor's phrase "these officers" as to which of petitioner's silences with the police the jury could consider — his pre- and/or his post- *Miranda* silence — when that phrase is taken in isolation, the state court could reasonably conclude that there was no *Doyle* error because the ambiguity was clarified by the context in which the prosecutor made the remark. Petitioner had not been questioned about his silence when he testified; the first time the jury heard about it was when the prosecutor remarked upon his silence in closing argument. When she made the remark, she had just discussed petitioner's encounter with Sergeant Randol on April 26 (Exh. B vol.29 at 3601) (emphasis added). The prosecutor

never said that petitioner was silent with the arresting officers or after his arrest. In addition, the prosecutor's comment about petitioner's silence with "these officers" occurred at the very end of the day, and upon resuming closing argument the following day, she said, "So when we left off yesterday, I was talking about Heather Randol and the . . . night of the 26th" (Exh. B vol.30 at 3619). Given that context, it was reasonable for the state court to determine that the prosecutor's comment referred only to petitioner's pre-arrest silence the night he encountered Randol and other officers at Ojeda's apartment, and not his post-arrest silence with other officers.

Even if *Doyle* error had occurred, moreover, it was not prejudicial because it did not have a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). There was only one mention of petitioner's silence, consisting of just one sentence in the entire argument. In addition, if the jury was confused as to which encounter with the police could be considered, such confusion was cured by the prosecutor the following day when she resumed argument and made clear that she was discussing the night prior to petitioner's arrest (Exh. B vol.30 at 3619). Lastly, any possible effect the error had was inconsequential in light of the evidence that petitioner committed voluntary manslaughter. While petitioner claims the prosecutor's argument allowed the jury to reject his defense theory, the verdict indicates that the jury gave petitioner the benefit of self-defense, albeit *imperfect* self-defense insofar as he was convicted of the lesser-included offense of voluntary manslaughter (Exh. A at 823-27). Under these circumstances, it is clear that the jury convicted petitioner based on the evidence, not based on any mistaken belief that they could rely on petitioner's silence as proof of guilt.

The state court's denial of petitioner's claim was neither contrary to nor an unreasonable application of federal law. Accordingly, petitioner is not entitled to relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition is **DENIED**.

A certificate of appealability will not issue because reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*,

529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the United States Court of Appeals.

The clerk shall enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED.**

Dated: April  25 , 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE